**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Margaret CANADA, Defendant-Appellant.**

**No. 75–2696.**

United States Court of Appeals, Ninth Circuit.

Dec. 29, 1975.

Rehearing and Rehearing En Banc Denied Feb. 25, 1976.

Wilfred C. Rice (argued), Detroit, Mich., for defendant-appellant.

Stephen W. Peterson, Asst. U. S. Atty. (argued), San Diego, Cal., for plaintiff-appellee.

## OPINION

Before HUFSTEDLER and WALLACE, Circuit Judges, and PALMIERI,* District Judge.

PALMIERI, District Judge:

This is an appeal from a judgment entered on a jury verdict finding appellant guilty of conspiracy to possess heroin and cocaine with intent to distribute, 21 U.S.C. § 846(a), and of possessing heroin and cocaine with the intent to distribute, 21 U.S.C. § 841(a)(1).

The appellant, travelling under an assumed name, boarded a scheduled air carrier in Detroit on February 16, 1975, bound for San Diego, taking with her a suitcase containing a large amount of cash. The concatenation of events occurring immediately prior to her departure from Detroit, and in San Diego after arrival, led to her arrest the next day as she was proceeding speedily by car on a major highway in the direction of Los Angeles.

The appellant challenges the legality of two searches and the probable cause for her arrest.

The facts which the jury could find from the evidence are substantially the following.

*The Airport Security Search in Detroit*

On February 16, 1975, Theresa Thomas, an airlines security guard, was on duty at the Detroit Metropolitan Airport checking the carry-on baggage of departing passengers for weapons and explosives with the aid of an x-ray machine as part of the airline's anti-hijacking program. At approximately 5:45 p. m. a male carrying a green suitcase and accompanied by appellant approached her station. As the suitcase went through the x-ray machine, half of it was displayed on the screen as an indeterminate dark area. Thomas told the male that the suitcase would have to be opened. The man asked why it had to be opened since there was nothing in it, and Thomas informed him that it was necessary to see what was inside since the x-ray machine did not show the contents of half of it. Appellant's companion did not reply. The appellant, standing next to him, said nothing. Opening the suitcase, Thomas found one article of clothing and a grocery bag with a rubberband around it. She opened the bag and saw stacks of 20- and 50-dollar bills. As she closed the bag and returned it to the suitcase, she noticed the figure $68,-000 inked on the front of the bag. As the couple left, appellant said something to her companion which Thomas did not hear, to which the man replied, "Don't worry about it; it's okay."

Thomas noted which gate the pair proceeded to, found that appellant Canada was flying under the name S. Taylor, and watched her board the plane for San Diego without her companion. Thomas reported all this to an agent of the Drug Enforcement Agency (DEA) at the airport.

The agent watched the male companion leave the airport and watched as he was arrested in the parking lot by local police for a traffic infraction. The agent learned from the local police that the man they had arrested was on record as a narcotics violator and that he was the son of two persons on record with the DEA as narcotics violators.

* Honorable Edmund L. Palmieri, United States District Judge, Southern District of New York, sitting by designation.

*The Events in San Diego*

This information was relayed to DEA agents in San Diego where surveillance of the airport was arranged in anticipation of appellant's arrival there. Appellant was met at the San Diego International airport by a male later identified as codefendant Turner. Appellant retrieved the green suitcase from a baggage conveyor belt and handed it to Turner. The couple then left the airport, walked into the parking lot, doubled back from the parking lot to the pedestrian island where they walked the length of the airport until they arrived at a waiting automobile driven by a female later identified as codefendant Welsh. During this maneuver, Turner continually glanced over his shoulder, paying particular attention to the front of the air terminal. In the course of driving to the downtown San Diego area, the trio executed a variety of maneuvers, including three or four U-turns in the middle of the block for no apparent reason, which are not satisfactorily explained by a lack of familiarity with the area, and which, in the opinion of one of the officers, were attempts to spot and lose any pursuer.

Appellant and Turner registered in a motel room as man and wife under assumed names. A second room was rented in Welsh's name. Three long distance calls to Detroit were made from one of the rooms, one to a known associate of the parents of the man who had accompanied appellant to the Detroit airport who were known narcotics violators. That evening as the trio drove to a cocktail lounge they executed numerous maneuvers apparently intended to flush out and abort any surveillance.

The next morning appellant took a cardboard box and the green suitcase to the room where the other two had stayed. She then walked to the downtown area of San Diego, returned at 1:30 after the others had left, and waited in a state of obvious agitation for their return.

Turner placed an empty yellow duffel bag in the car and shortly thereafter he and Welsh drove directly to Mexico, crossing the border at 11:30 a. m. They were next seen returning to the motel at 4:10 p.m. Immediately thereafter, Turner rapidly removed from the car and carried into the motel a paper sack and the yellow duffel bag which appeared to contain objects which made the bottom form a V. Within four or five minutes, Turner came out of the room carrying the green suitcase and walking at a rapid pace. He almost threw the suitcase into the trunk of the car, and followed it with the duffel bag that now looked full and well packed. Turner positioned the vehicle near the motel office while appellant was inside. When appellant came out of the office, she entered the car with the other two and Turner drove off at a fairly fast rate of speed, proceeded to an interstate highway and headed north. The DEA agents then stopped the car with the aid of uniformed police. They searched the car, found four pounds of heroin and one pound of cocaine in the green suitcase, and arrested appellant and her two codefendants.

*The Airport Search of the Suitcase was Conducted Pursuant to a Valid Consent*

Appellant's first complaint is that her fourth amendment rights were violated when the green suitcase being carried by her male companion was searched by an airline employee at the Detroit airport. If she should prevail on this issue, the charges against her require dismissal as the balance of the government's case would be the fruit of a poisoned search. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 391–92, 40 S.Ct. 182, 64 L.Ed. 319 (1920). However, we find no legal infirmity in the search. We find it was conducted pursuant to a valid consent.

▮▮▮ First, there can be no doubt that the actions of the airline security guard constituted state action for fourth amendment purposes. *United States v. Davis*, 482 F.2d 893 (9th Cir. 1973). Second, the government argues that appellant does not have standing to object to the search because the searcher could

not have known the luggage was in her custody. This is not a requirement for standing to object. The state of mind of the searcher regarding the possession or ownership of the item searched is irrelevant to the issue of standing.[1] Rather, standing to object is predicated on the objector alleging and, if challenged, proving he was the victim of an invasion of privacy. *Jones v. United States*, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). In her original motion to suppress, appellant claimed the suitcase as hers. The government has not disputed this claim of ownership. In fact, the government's evidence that she transported it to San Diego and was seen with it there on several occasions lends support to her claim. This is sufficient to confer on appellant standing to object to its search.

 The fact that appellant was not openly exercising control over the suitcase immediately prior to the search does not defeat her standing. *United States v. Mulligan*, 488 F.2d 732 (9th Cir. 1973), cert. denied, 417 U.S. 930, 94 S.Ct. 2640, 41 L.Ed.2d 233 (1974) (car owner could object to its search though he had no control over the car when it was searched, had registered it under a fictitious name and had parked it in an acquaintance's driveway for over two months). Furthermore, she did not relinquish her protectible interest, nor her standing to object, by sharing access and control of the suitcase with her companion. *Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968).

 This brings us to the question of consent. The Supreme Court in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), held that whether a consent to search is vol-

untary is a question of fact to be determined from all the circumstances and that the government is not required to prove knowledge of a right to withhold consent as a sine qua non of an effective consent. In *Davis, supra*, we dealt with an airport search similar to the instant case and held that the threshold question of whether or not there had been consent-in-fact must be decided in the affirmative before the precise *Bustamonte* question of voluntariness could be broached. The present case falls somewhere between the verbal consent in *Bustamonte* and the facts in *Davis*. As anticipated in *Davis*, we find that "the alternatives presented to a potential passenger approaching the screening area are so self-evident that his election to attempt to board necessarily manifests acquiescence in the initiation of the screening process." 482 F.2d at 914. Since the 1971 search in *Davis*, the nature and scope of airport searches have become much more widely known. Such searches have become an almost universal practice. The suitcase in question was voluntarily placed on a conveyor belt that led directly to the checkpoint and through an x-ray machine. While appellant and her companion may not have expected the contents of the suitcase to be subjected to a visual search,[2] the facts here are sufficient to support a finding of voluntary consent-in-fact to this further search. In *Davis*, the appellant's briefcase " 'was taken from his hand, opened before he had a chance to really do or think anything,' " 482 F.2d at 914. In contrast, the airline agent here asked the appellant's companion for permission to open the suitcase and explained the need to do so before opening it.[3] Neither he nor appellant, who was

---

1. But see *United States v. Matlock*, 415 U.S. 164, 177 n.14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), where the Court leaves open the question whether the government satisfies its burden for establishing third-party *consent* to a search by showing that the searching officers reasonably believed that the third party had sufficient authority over the area searched to consent to the search.

2. Only when baggage failed to pass the x-ray test was it subjected to visual search.

3. "Q. All right. Now, what, if anything, did you say to the male that was carrying this green suitcase?
A. I took the bag over to the end of the belt and I asked the male if I could open it up. I had to check it, and he asked my why I had to open it and he said there wasn't anything in it, and I told him that it was necessary to tell what was inside because I couldn't read the x-ray machine, and he didn't say anything, so I opened up the bag.

present throughout the exchange, objected. The airline agent was fully justified in assuming she had the consent of both. We think this constitutes consent-in-fact voluntarily given.

■ Appellant further objects that she could not be bound by her companion's consent to the search, claiming that the cases which upheld third-party consent all involved absentee defendants. To refute this proposition, one need look no further than the leading case appellant cites, *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). There, the defendant was arrested in the yard of the house where he was staying. The officers did not ask his consent to search the house. They went to the door and obtained permission to search from a woman who was living there with him. The Court looked not to the defendant's presence or absence but to whether or not the third party "possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." 415 U.S. at 171, 94 S.Ct. at 993. Common authority, the Court said,

> rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

415 U.S. at 171 n.7, 94 S.Ct. at 993. Applying this language to the case before us, we find that appellant granted her companion sufficient control over the suitcase so that it is reasonable to conclude that she assumed the risk that he might permit it to be searched at the airport check point. Additionally, the preponderance of the evidence would warrant a finding that appellant was acting as a courier and that her companion was in full charge of the boarding operation and gave effective consent on her behalf.

Q. Where was the female during this period of time?

## The Stop and Search of the Automobile in San Diego was Valid

■ Appellant next complains that there was no probable cause for the stop and search of the car, for the search of the green suitcase in the trunk of the car, or for the arrest of appellant and her companions, all of which were accomplished without warrants. She further argues that Welsh's consent to search the car did not give the police the right to search the green suitcase. We have concluded that, upon the totality of the circumstances in this case, there was probable cause for the warrantless stop and search of the car. Sufficient basis for the warrantless arrests arose upon the finding of contraband in the car. We do not reach the question of consent since the probable cause to search encompassed a search of the suitcase.

■ A search that is warrantless is nevertheless valid if the officers have probable cause to believe that the object of the search contains contraband and there exists the exigent circumstance that it is "threatened with imminent removal or destruction." *Hernandez v. United States*, 353 F.2d 624, 627 (9th Cir. 1965), *cert. denied*, 384 U.S. 1008, 86 S.Ct. 1972, 16 L.Ed.2d 1021 (1966). We find that the officers here had probable cause to believe that the car, and the suitcase being transported therein, contained contraband. In arriving at this conclusion, we have considered all the relevant facts known to the officers, as set forth above, and all the reasonable inferences that could be drawn from these facts by the officers. Appellant analyzes each bit of information the officers had, expounding on the tenuous nature of some and fashioning an innocent fabric for others. "Unquestionably, no one item of the government's evidence, considered in isolation, would have been sufficient . . ." to establish probable cause. *United States v. Patterson*, 492 F.2d 995, 997 (9th Cir. 1974). However, even assuming that all these facts could be given some explanation consistent with innocent behavior, which is dif-

A. Right beside him."

**1380**

ficult to assume here, there nevertheless came a time at which

> [t]he succession of superficially innocent events had proceeded to the point where a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one.

*Patterson, supra,* 492 F.2d at 997. *See United States v. Martin,* 509 F.2d 1211 (9th Cir. 1975). "A search based upon [the] concurrence [of the events here] would not likely invade the privacy of an innocent person." *Hernandez, supra,* 353 F.2d at 627.

 The items to be searched, the car and the suitcase, were certainly "threatened with imminent removal." Appellant and her companions drove away from the motel "at a fairly fast rate of speed" and were headed north out of San Diego on an interstate highway. Since there was probable cause to believe that the car contained contraband, these facts fit the "automobile exception" to the requirement of a search warrant. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) and cases cited therein; *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

 Appellant argues that the exceptional circumstances rule is not applicable because the officers had time to obtain a warrant and did not do so. The burden rests on the government to prove that it was not practical to secure a warrant before the car was stopped. *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *Hernandez v. United States,* 353 F.2d 624 (9th Cir. 1965). However, appellant errs in suggesting that the officers were required to begin seeking a warrant at 11:30 a. m. when the car crossed the border into Mexico. The officers may well have thought that there was insufficient probable cause to support a warrant until the car returned from Mexico. Nor could they predict the time when or the place at which the car would recross the border. After the return to the motel at approximately 4:10 p.m., they had several additional indicia of crime to lend weight to a case for probable cause: the car had made a short trip across the border in an area with a high incidence of contraband smuggling carrying a suitcase in which large amounts of cash had been seen; the car had left with the duffel bag empty and returned with it containing something that caused its bottom to sag; and the persons under surveillance were in a great rush to depart from the motel after their return from Mexico. The fourth amendment does not require that the government act precipitously or apply for a warrant prematurely. The officers could properly extend their surveillance in an attempt to obtain additional evidence or to expand the reach of the dragnet to ensnare other, as yet unknown, confederates. Moreover, the unpredictable unfolding of this criminal drama clearly left the agents uncertain as to when or where to expect narcotics to appear. Indeed, the automobile in question had left the United States and the agents could not be certain that it would reappear in the Southern District of California, much less know just when to expect it. The rapid succession of events after it reappeared, including the brief period of little over five minutes in total spent at the motel, precluded any possibility of the agents approaching a magistrate at that juncture. The government has satisfied its burden of demonstrating that there was insufficient time to procure a warrant.[4]

*Conclusion*

We have examined the other grounds urged by appellant for reversal and find them meritless. We are satisfied after examination of the entire record that appellant received a fair trial free from judicial error.

The judgment of conviction is affirmed.

---

4. The government testimony that February 17, 1975, was a federal holiday does not alone satisfy this burden, but it is probative of the time that would have been required to obtain a warrant on that day.