**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Michael D. JACOBSON and David Van**
**Bodegraven, Defendants-Appellees.**

**No. 80–1571.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 9, 1981.

Decided June 12, 1981.

Rehearing Denied July 15, 1981.

Kenneth Berlin, Washington, D.C., for plaintiff-appellant.

William J. Risner, Tucson, Ariz., for defendants-appellees.

Before TRASK and SNEED, Circuit Judges, and THOMPSON,* District Judge.

BRUCE R. THOMPSON, District Judge:

We have for consideration an appeal from an order of the district court granting defendants' motion to suppress evidence. This court has jurisdiction pursuant to 18 U.S.C. § 3731.

* Honorable Bruce R. Thompson, Senior United States District Judge, District of Nevada, sitting by designation.

The district court made thorough findings of fact which are supported by substantial evidence. Perhaps the issue may best be highlighted by first reciting the facts as found by that court.

## FACTS

In early 1980 United States Customs began an investigation into large scale parrot smuggling from Mexico into the United States. Specifically, the investigation would be directed at the activities of defendant Jacobson who operated a pet store on West Ajo Way in Tucson. Customs enlisted Mr. Gustavo Preciado to act as an informant in the investigation. The informant was dispatched to the interior of Mexico. On April 20, 1980, the informant called Customs agents and informed them that a large quantity of parrots were going to be shipped from Ruiz, Mayarit, Mexico, to Hermosillo, Sonora, Mexico, for eventual smuggling into the United States at Nogales.

On April 28, 1980, in Nogales, Sonora, Mexico, the informant was present at a meeting between defendants Beatriz Quintero De Fajardo, Cosme Guerrero-Ibarra and Michael Jacobson. Defendant Moises Moreno-Perez served as interpreter. Business arrangements were concluded with regard to the purchase of the parrots by Jacobson. A business card was shown at the meeting, which had directions to defendant Jacobson's business on West Ajo on the back. Jacobson destroyed the card at the meeting and informed the others present that they should not carry any papers that would show any type of relationship with him. Jacobson further agreed to provide legal help if they should be arrested. The informant communicated the results of the meeting to Customs.

On April 29, 1980, arrangements for the smuggling of the birds were completed. Since no other vehicles were available, the informant agreed to use his van. This information was also communicated to government agents.

On April 30, 1980, at 3:00 p. m., the informant called Customs agents and informed them that everything was arranged for the delivery of the parrots to defendant Jacobson in Tucson that evening. According to the plan, defendant Fajardo would drive from Nogales to Tucson, and meet the informant with the birds in the van at the K-Mart Shopping Center on Valencia Road in Tucson. There they would trade vehicles with the women taking the van with the parrots for the actual delivery to Jacobson at his residence.

At approximately 6:00 p. m. on April 30, 1980, the informant crossed the port of entry from Mexico into the United States. He was driving a white Chevrolet van. The van moved down along the international border fence and stopped. The van then proceeded to Tucson, Arizona. The parties stipulated for the purposes of this motion, that from the time the van left the small hill or the large hill until the time it went to the front gate of Mr. Jacobson's house, it was surveilled and nothing was observed going in and out of the van except people. The van arrived at the K-Mart in Tucson at about 7:15 p. m.

Defendant Fajardo, together with another woman, crossed the border at Nogales in a black over blue Ford LTD at 6:20 p. m. The Ford was kept under constant surveillance from Nogales until it arrived at the K-Mart at 7:45 p. m. The women traded vehicles with the informant, then proceeded in the van to 4340 West Ajo Way. They arrived at 8:10 p. m.

4340 West Ajo Way is a combination personal residence and commercial pet store that is jointly owned by defendants Jacobson and Van Bodegraven. The property is completely fenced with barbed wire fence, with gates that allow access to the property from two sides. There are several buildings in the compound, together with a swimming pool and some permanent animal cages. None of the cages nor anything other than the tops of houses are visible from public roads.

Shortly after the women arrived at the gate, a vehicle drove from the house to where the van was parked. A gate was opened, and the van moved into the com-

pound. At 8:28 p. m. the property was completely surrounded by government agents who were in constant radio contact. No ingress or egress could have been accomplished on the property without detection by the officers. Agents, without either arrest or search warrants, entered the property from two sides. The gates were closed at the time the agents made their entry. Further, the agents were ordered to break locks on the gates, if necessary, to gain admission to the property. While on the property, agents found two small cages within the large animal cages on the premises that contained 154 parrots.[1]

The court's statement of facts may appropriately be supplemented. The van was in sight of and under the surveillance of Customs Agent Wells. He and other agents saw another vehicle drive down to the locked gate, someone opened it, and the van was driven up the roadway a short distance. The gate was closed but not locked. It was dark. The Customs agents converged on the gate. They saw flashlights moving toward the area where they had been informed that animals and birds were kept in cages. The agents entered. Agent Burns went directly to the white van and there were no birds in it. He and Agent Wells encountered defendants approximately simultaneously near the bird cage area and arrested them. They found two cages packed with parrots which, inferentially, were in the same cages in which they had been transported. The seized birds were found and the defendants arrested approximately 100 feet from the house in a brushy area south of the swimming pool.

■ The government's effort to excuse failure to obtain a search warrant on the theory of probable cause and exigent circumstances under the related facts is futile. In this respect we agree with the district court. With respect to the second contention, however, we agree with the government that the search and seizure here were proper and reasonable as an extended border search. The district court held that a border search could not be conducted after the van and contents had entered onto the private property owned by defendants. We disagree.

In the first place, the fact that the search was conducted on private property is not dispositive. Since *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), property interests have had slight import in the administration of the Fourth Amendment. In *United States v. Magana*, 512 F.2d 1169 (9th Cir. 1975) (a warrantless search of a private driveway), this court observed:

> The question deferred in Bustamante-Gamez is before us again. The driveway where Magana was arrested was within the curtilage of the house Magana was using, but "a reasonable expectation of privacy," and not common-law property distinctions, now controls the scope of the Fourth Amendment. See *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).
>
> The proper inquiry is whether the officers' intrusion into the residential driveway constituted an invasion into "what the resident seeks to preserve as private even in an area which, although adjacent to his home, is accessible to the public * * *." *Wattenburg v. United States*, 388 F.2d 853, 857 (9th Cir. 1968).
>
> A driveway is only a semiprivate area. The expectation of privacy which a possessor of land may reasonably have while carrying on activities on his driveway will generally depend upon the nature of the activities and the degree of visibility from the street. It would be equally unwise to hold, as a matter of law, that all driveways are protected by the Fourth Amendment from all penetrations by police officers as to hold that no driveway is ever protected from police incursions. The test in each case should be that of reasonableness, both of the possessor's ex-

---

1. From the foregoing statement of facts the court concluded: "Clearly, when the van entered private property, the scope of the border search was exceeded, and other justification for the warrantless entry would be needed."

pectations of privacy and of the officers' reasons for being on the driveway.

Here, the officers were providing security for their fellows who were known to be effecting the arrest of a narcotics dealer engaged in business in the residence of which the driveway formed a part. The act of the officers in turning into the driveway at the time and under the circumstances of this case was reasonable. Magana's privacy was not unreasonably invaded when the officers entered his driveway and then saw him throw something away. See *United States v. Capps*, 435 F.2d 637 (9th Cir. 1970).

See also: *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (a warrantless arrest on private property of arrestee); *United States v. Allen*, 633 F.2d 1282 (9th Cir. 1980) (at p. 1291, "It was not necessary for them (the officers) to secure an arrest warrant for the arrest made on Allen's property but not in his home."); *United States v. Capps*, 435 F.2d 637 (9th Cir. 1970) (observation of contraband in locked car while on the curtilage of the owner's residence); *United States v. Pruitt*, 464 F.2d 494 (9th Cir. 1972); *United States v. Freie*, 545 F.2d 1217 (9th Cir. 1976).

The entire subject of extended border searches has been so recently canvassed in elaborate opinions of this and other courts that we are not disposed to burden the literature with extensive discussion. We allude primarily to the opinions in *United States v. Espericueta-Reyes*, 631 F.2d 616 (9th Cir. 1980); *United States v. Moore*, 638 F.2d 1171 (9th Cir. 1980) and *United States v. Richards*, 638 F.2d 765 (5th Cir. 1981). (None of these was available to the district court when it ordered suppression). We note also the decision in *United States v. Stanley*, 545 F.2d 661 (9th Cir. 1976), which applies the extended border search concept to exports as well as imports.

Suffice it to say, that we believe the facts of this case sustain the searches and seizures as a legal and reasonable extended border search because the totality of circumstances surrounding the search, including the time elapsed after the initial border crossing and the distance from the border are such as to convince the fact finder with reasonable certainty that any contraband which might be found in or on the vehicle at the time of the search had been unlawfully imported and was in the vehicle at the time of or immediately subsequent to the unlawful entry. Cf. *Alexander v. United States*, 362 F.2d 379 (9th Cir. 1966); *United States v. Markham*, 440 F.2d 1119 (9th Cir. 1971); *United States v. Weil*, 432 F.2d 1320 (9th Cir. 1970).

Congress has enacted specific authorizations to Customs agents: 19 U.S.C. § 482, 19 U.S.C. § 1581(a), 19 U.S.C. § 1595(b).[2] In the context of determining whether respondents' reasonable expectation of privacy can be determined by the location of the barbed wire fence, these expressions of Congressional intent cannot be ignored. *United States v. Di Re*, 332 U.S. 581, 585, 68 S.Ct. 222, 224, 92 L.Ed. 210 (1948); *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).[3] Congress has express-

---

**2.** "stop, search, and examine ... *any* vehicle ... and ... any truck or envelope, *wherever found*, ..." 19 U.S.C. § 482 (emphasis supplied;) "at any time go on board of any vessel or vehicle *at any place* in the United States ..." 19 U.S.C. § 1581(a) (emphasis supplied;) and, 'if deemed necessary,' to enter into or upon or pass through the lands, enclosures, and buildings, *other than the dwelling house*, of any person whomsoever, in the discharge of his official duties." 19 U.S.C. § 1595(b) (emphasis supplied).

**3.** "Contrary to the Court of Appeals' view, Watson's arrest was not invalid because executed without a warrant. Title 18 U.S.C. § 3061(a)(3) expressly empowers the Board of Governors of the Postal Service to authorize Postal Service officers and employees 'performing duties related to the inspection of postal matters' to

'make arrests without warrant for felonies cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such a felony.'

By regulation, 39 CFR § 232.5(a)(3) (1975), and in identical language, the Board of Governors has exercised that power and authorized warrantless arrests. Because there was probable cause in this case to believe that Watson had violated § 1708, the inspector and his subordi-

ly authorized the entry upon the "lands, inclosures and buildings, other than the dwelling house, of any person whomsoever." In further support of the conclusion that defendants had no such reasonable expectation of privacy as to preclude an extended border search of the vehicle (van) and the animal and bird cage area we rely on the undisputed evidence that defendants' fenced compound was not simply a residence but was also a place of business; that a couple of months previously one of the Customs agents had visited the establishment as a purported business visitor and had observed the layout of the roads, buildings and bird and animal cages; that on the night of the search and seizure the officers surveilling the premises saw flashlights moving about in the brushy area known to be the situs of the bird cages, which was a considerable distance from the residence itself; that defendants had unlocked the gate and had permitted entry onto the premises of a vehicle which they believed to contain parrots which had just been unlawfully imported from Mexico and with the imputed knowledge that the vehicle and contents were under the Customs laws the possible subjects of search and seizure wherever found. This totality of circumstances persuades us that the search and seizure in question was a legal extended border search and was reasonable vis-a-vis the constraints of the Fourth Amendment to the Constitution of the United States.

■ Defendants, nevertheless, contend that the entry on private property was unreasonable and unnecessary because the officers already had the evidence they needed, that is, proof of the illegal importation and of the identity of the conspirators. The prime source of all this proof is Preciado, the informant and an accomplice. Such testimony universally invokes cautionary instructions (Federal Jury Practice and Instructions, Devitt & Blackmar, §§ 17.02, 17.06), despite the fact that it may be legally sufficient to sustain a conviction. *United States v. Andrews*, 455 F.2d 632 (9th Cir. 1972). It is evident that trailing the contraband to its ultimate recipient is very useful corroboration. This is an approved purpose of an extended border search. *United States v. Canada*, 527 F.2d 1374 (9th Cir. 1975); *Alexander v. United States*, 362 F.2d 379 (9th Cir. 1966).

The order granting the motion to suppress is reversed.

nates, in arresting Watson, were acting strictly in accordance with the governing statute and regulations. The effect of the judgment of the Court of Appeals was to invalidate the statute as applied in this case and as applied to all the situations where a court fails to find exigent circumstances justifying a warrantless arrest. We reverse that judgment.

"Under the Fourth Amendment, the people are to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ... and no Warrants shall issue, but upon probable cause ..." Section 3061 represents a judgment by Congress that it is not unreasonable under the Fourth Amendment for postal inspectors to arrest without a warrant provided they have probable cause to do so. This was not an isolated or quixotic judgment of the legislative branch. Other federal law enforcement officers have been expressly authorized by statute for many years to make felony arrests on probable cause but without a warrant. This is true of United States marshals, 18 U.S.C. § 3053, and of agents of the Federal Bureau of Investigation, 18 U.S.C. § 3052; The Drug Enforcement Administration, 84 Stat. 1273, 21 U.S.C. § 878; the Secret Service, 18 U.S.C. § 3056(a); and the Customs Service, 26 U.S.C. § 7607.

"Because there is a 'strong presumption of constitutionality due to an Act of Congress, especially when it turns on what is "reasonable," ' '[o]bviously the Court should be reluctant to decide that a search thus authorized by Congress was unreasonable and that the Act was therefore unconstitutional.' *United States v. Di Re*, 332 U.S. 581, 585, 68 S.Ct. 222, 224, 92 L.Ed. 210 (1948). Moreover, there is nothing in the Court's prior cases indicating that under the Fourth Amendment a warrant is required to make a valid arrest for a felony. Indeed, the relevant prior decisions are uniformly to the contrary."