637 P.2d 1237

**STATE of New Mexico,**
**Plaintiff-Appellee,**

v.

**Abel GONZALES, Defendant-Appellant.**

No. 5238.

Court of Appeals of New Mexico.

Nov. 12, 1981.

Writ of Certiorari Denied Dec. 18, 1981.

Albert H. Engel, Engel & Olszta, Las Cruces, for defendant-appellant.

Jeff Bingaman, Atty. Gen., Carol J. Vigil, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

WOOD, Judge.

Charged with possession of marijuana with intent to distribute, defendant moved to suppress the marijuana. The trial court denied the motion, ruling that the stop of defendant, the search of his automobile and the search of his suitcase were conducted in conformity with federal law and not in violation of the Fourth Amendment prohibition of an unreasonable search and seizure. We granted an interlocutory appeal. We (1) set forth the facts introduced at the evidentiary hearing on the motion; (2) point out that the marijuana was not seized in conformity with general Fourth Amendment law; and (3) discuss the propriety of the seizure under the border search exception to the Fourth Amendment.

*Facts*

We must view the evidence in the light most favorable to the prosecution. *State v. Manus*, 93 N.M. 95, 597 P.2d 280 (1979); *State v. Lankford*, 92 N.M. 1, 582 P.2d 378 (1978). See *State v. Padilla*, 95 N.M. 86, 619 P.2d 190 (Ct.App.1980). The evidence most favorable to the State follows.

Mount Cristo Rey is on the border of the United States and Mexico; it overlooks the community of Anapra, New Mexico. The border is less than two miles from McNutt Road in Anapra. The area between the border and Anapra is basically uninhabited. Also, "[t]here's no wild animals .... It's almost denuded area of any vegetation that would harbor any animals." Within this area, the Border Patrol had placed electronic sensors to detect "intrusions" by people using pathways to enter the United States from Mexico.

On the evening of January 16, 1981, agents of the Border Patrol were in Anapra looking out for intrusions because interception of illegal aliens in that area is a daily occurrence. Around 9:30 or 9:40 p. m., an agent was notified by the dispatcher that one of the sensors had tripped. This sensor was on a "well-known pathway for persons entering from Mexico" and between one-half and three-quarters of a mile from McNutt Road.

Because of the nature of the terrain, a person using the pathway could "come out" at several places; it depended on the gully that was used. "[A] person could sit on one trail and not see these people, depending on which route they've taken." After being notified that the sensor had tripped, two agents stationed themselves on the trail that a person "could have come down." Two other agents, Berry and Garcia, stationed themselves to look along McNutt Road "to see if anybody coming out of this

area would come across this road and we would be able to spotlight them by the background lights that were present in the area." Berry had been a border patrol agent for six years and had worked the Mount Cristo Rey area two-to-three years. Garcia had been with the Border Patrol for three and one-half years, and had about one and one-half years' experience in the area.

The weather was cold. "I [Berry] would estimate the temperature was around 40 degrees and there was an intermittent rain falling."

Berry testified: "Through those gullies and canyons [between Anapra and the border], there's not any traffic at all in that time of night usually; especially with the weather conditions. The local people will get up in there when it's warm or in the daytime, but in my experience at night, under those conditions, I've never found anybody up there."

Berry testified that, within the community of Anapra, there were a few cars, but the traffic was not the "usually heavy traffic like it would normally be." Berry did not notice any of the local people on foot. "There may have been one or two, but at that hour and with that weather, it's not usual for people to be out walking around."

After waiting between fifteen-to-twenty minutes, Berry saw an individual cross the road in an unhurried fashion; Berry thought this person "could be a local." A few minutes later he saw two other people cross the road. One of these two had the large silhouette of a backpack, "the top of the backpack stuck over his head . . . ." "It was a very large pack. It wasn't the type that you would normally associate with somebody going hiking or camping." These two people disappeared into the dark area in the rear of the Morocco Club. A person walking from the tripped sensor to the road would have reached the road about the time these people crossed the road.

Berry and Garcia drove to where the people crossed the road. Garcia got out of the patrol vehicle to search for the people. Berry left and contacted the agents stationed on the trail; Berry returned in three-to-five minutes and picked up Garcia.

Garcia testified that he got out of the patrol vehicle "right behind the Morocco Club," went past some houses "to an open little field" to look for tracks. He observed tracks of at least two people and followed the tracks "half way" in the open area. On the basis of his tracking experience he considered the tracks to be fresh. At that point he observed an individual under a pole with a light; the individual was stuffing something inside the trunk of a vehicle. The tracks Garcia were following "led in that same direction where that car was at." The vehicle, in the nature of a Camaro or Firebird, was a dark color; other than this vehicle "there really weren't any cars around that area." Garcia's conclusion that something was being stuffed inside the trunk of the vehicle was on the basis "that the trunk was open, closed, reopened and somebody bent inside of the trunk and then closed the trunk[.]" With these observations, Garcia ceased tracking, returned to, and was picked up by, Berry and reported his observations to Berry.

Berry decided to investigate the car observed by Garcia. "We went to turn in there [in the rear of the Morocco Club] when we encountered this car coming out. My partner said, 'That's the car that I saw the man putting something into.'" This car pulled into the parking lot of the Morocco Club and parked. "The driver got out and walked into the Morocco Club looking back over his shoulder at us all the time." Garcia described the driver as walking "hurriedly and looking back at us; very nervous to me, it seemed like." The agents made a quick search of the area where Garcia had observed activity in connection with the trunk of a car. This area was 25-to-50 yards from the Morocco Club. "We couldn't find anything." Asked if he had any serious doubt that the car that parked in the parking lot of the Morocco

Club was the same car previously observed, Garcia testified: "I wouldn't swear, but I'm sure that that was the vehicle."

Returning to the Morocco Club parking lot, the agents observed some wet ponchos on the back seat of the parked car. Garcia testified the ponchos "were soaking wet. The window was rolled down and we were looking around in the car." According to Garcia, there had been a light drizzle for two hours prior to this observation. A check was run on the car, there was a call for assistance from "Customs," and agents were sent into the club to get the defendant, who was the driver of the car.

Defendant was placed in the "containment" area of the Border Patrol vehicle, was read his "*Miranda*" rights, was told the agents were investigating the possibility of illegal aliens, and was asked if he would open the trunk of the car. Defendant had given the agent some keys, none of which would open the car trunk. Defendant said he did not have a key to the trunk. An agent heard something metallic drop to the floor of the containment area; it was the key to the trunk. At about this time the "Customs Patrol Agent" arrived; this agent was informed of the Border Patrol agents' activities and observations.

Defendant opened the trunk after being advised that the Customs agent was going to open the trunk and do a "customs border search". In the trunk was a "large" suitcase, probably one foot deep and four-by-four feet in length and width. The suitcase was tied to a backpack frame. The suitcase "had water all over it. It had been raining. There was mist on the suitcase itself and it looked like quite damp." The Customs agent opened the suitcase; it contained marijuana wrapped in newspaper and cellophane. This marijuana is the basis of the criminal charge and is the marijuana that defendant sought to suppress.

*General Fourth Amendment Law*

■ The parties argue the propriety of each step of the proceedings under Fourth Amendment decisions. The propriety of these steps need not be discussed. Whether or not the initial stop, the detention of defendant, the detention of defendant's automobile, the entry into the trunk of the automobile, and the seizure of the suitcase were valid makes no difference. The opening of the suitcase was invalid under general Fourth Amendment law. No evidence indicates that the suitcase was opened with defendant's consent. No warrant authorized the opening of the suitcase. If general Fourth Amendment law applies, the evidence should have been suppressed under *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). See *State v. White*, 94 N.M. 687, 615 P.2d 1004 (Ct.App. 1980).

■ Although the State's appellate theories are ambiguous, in the trial court, the State contended that the facts established a valid border search. Defendant contends that general Fourth Amendment law applies to border searches. The cases relied on by defendant do not support this contention. Those cases are: *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Rengifo-Castro*, 620 F.2d 230 (10th Cir. 1980); *United States v. Gooch*, 603 F.2d 122 (10th Cir. 1979); *State v. White*, supra; *State v. Franco*, 94 N.M. 243, 608 P.2d 1125 (Ct.App. 1980). In each of these cases there was some factual relationship to the border; each of these cases applied general Fourth Amendment law; however, none of these cases applied the border search exception to the Fourth Amendment.

*United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), discussed the border search exception:

Border searches, then, from before the adoption of the Fourth Amendment, have

been considered to be "reasonable" by the single fact that the person or item in question had entered into our country from outside. There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause. This longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless "reasonable" has a history as old as the Fourth Amendment itself. We reaffirm it now.

\*     \*     \*     \*     \*     \*

[T]he "border search" exception is not based on the doctrine of "exigent circumstances" at all. It is a longstanding, historically recognized exception to the Fourth Amendent's [sic] general principle that a warrant be obtained . . . .

Whether the marijuana should have been suppressed depends on whether its seizure occurred in accordance with the border search exception.

*Border Search Exception*

*United States v. Ramsey*, supra, points out that a traveler may be stopped in crossing an international boundary and be required to identify himself and his belongings; that a traveler's right to be let alone does not prevent the search of his luggage at the border and the seizure of illegal materials discovered during such a search; that, historically, such broad power has been necessary to prevent smuggling.

Such a search may be done at the border; what, however, is the meaning of "border"? United States Supreme Court decisions are to the effect that "border" means the actual border, and functional equivalents of the border. *Almeida-Sanchez*, supra; *Brignoni-Ponce*, supra; *Ortiz*, supra.

■ The search in this case did not occur at the actual border. Did it occur at a functional equivalent? *Almeida-Sanchez*, supra explained "functional equivalent":

[S]earches at an established station near the border, at a point marking the conflu-

ence of two or more roads that extend from the border, might be functional equivalents of border searches. For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search.

The facts in this case do not show a "functional equivalent" search as that term is used in *Almeida-Sanchez*, supra.

■ Another category appearing in the decisions is the "extended border" search. The federal decisions have recognized this category. We are not concerned with whether "extended border" comes under "actual border" or "functional equivalent" of the border. We agree with footnote 11 in *United States v. Johnson*, 588 F.2d 147 (5th Cir. 1979), which states:

This is a semantic difference only. Properly conceived, an extended border search is the functional equivalent of a search at the border since the object under surveillance "brings the border with it" to the point of search. *See United States v. Brennan*, 538 F.2d [711] at 715.

Although not expressly recognized in that decision, *Almeida-Sanchez*, supra, indirectly referred to this category in stating: "[T]here was no . . . assurance that the individual searched was within the proper scope of official scrutiny—that is, there was no reason whatever to believe that he or his automobile had even crossed the border . . . ."

On what basis is the "extended border" concept to be applied? Our discussion of this question refers only to the later decisions in particular federal circuits; we do not attempt to trace the evolution of the rule stated in these later decisions.

The Fourth Circuit, in *United States v. Bilir*, 592 F.2d 735 (4th Cir. 1979), states:

The test of validity [of an extended border search] is one of reasonableness under the circumstances. For this, no rigid formula can be prescribed. Time and dis-

tance factors may be of importance, but are not alone decisive. Ultimately the question is simply whether under all the circumstances—time and distance factors included—the customs officials had a reasonable basis for the suspicion leading to the search away from the actual border. *See United States v. McGlone*, 394 F.2d 75, 78 (4th Cir. 1968). Their suspicions must be reasonable not only with respect to the nature of the material seized, but to the fact that it has indeed illegally crossed a border within a reasonably recent time. *See United States v. Weil*, 432 F.2d 1320, 1322–23 (9th Cir. 1970).

The Fifth Circuit, in *United States v. Richards*, 638 F.2d 765 (5th Cir. 1981), states:

(a) It must be established by a preponderance of the evidence that a border crossing has occurred.

(b) The government must show "with reasonable certainty, that conditions remained unchanged from the time of the border crossing until the subsequent warrantless search.... In other words, it must be established with reasonable certainty that, when searched, the person or thing was in the same condition as when the border was crossed."

(c) "[B]efore conducting a warrantless extended border search, the government agents must possess a reasonable suspicion, supported by articulable facts, that the person or thing searched is involved in illegal activity, such as smuggling contraband."

The Ninth Circuit, in *United States v. Jacobson*, 647 F.2d 990 (9th Cir. 1981), states there was a "legal and reasonable" extended border search

because the totality of circumstances surrounding the search, including the time elapsed after the initial border crossing and the distance from the border are such as to convince the fact finder with reasonable certainty that any contraband which might be found in or on the vehicle at the time of the search had been unlaw-

fully imported and was in the vehicle at the time of or immediately subsequent to the unlawful entry.

*United States v. Moore*, 638 F.2d 1171 (9th Cir. 1980), refers to a reasonable certainty of a border crossing and any contraband found was aboard when the border was crossed. *United States v. Driscoll*, 632 F.2d 737 (9th Cir. 1980), states that "reasonable certainty" is a higher standard than probable cause, but less than proof beyond a reasonable doubt.

The above circuit decisions differ in stating the basis for applying the extended border category. However, two concepts are common to these decisions. The first concept is proof that a border crossing has occurred; because an "extended" border is involved, this first concept has two parts. Those parts are: a border crossing and an absence of change after crossing the border. The second concept is the authority of an agent to search once the facts establish a border crossing.

■■■ Searches made at the border "are reasonable simply by virtue of the fact that they occur at the border ...." *United States v. Ramsey*, supra. For the extended border category to be applicable there must have been a border crossing. A border crossing is a critical fact. *United States v. Ramsey*, supra.

What proof is required to establish a border crossing? The Fourth Circuit (*Bilir*, supra) suggests that an agent's reasonable suspicion of a border crossing is sufficient. The Fifth Circuit (*Richards*, supra) required proof by a preponderance of the evidence that a crossing occurred. The Ninth Circuit (*Driscoll*, supra) required the agents to have a firm belief that a crossing occurred, and in *Jacobson*, supra, required the crossing be established with reasonable certainty.

*Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), held that questions of admissibility of evidence were to be determined by a preponderance of the evidence: "[T]he prosecution must prove at

least by a preponderance of the evidence that the confession was voluntary." *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), in footnote 14, states: "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." The Ninth Circuit, in *United States v. Marshall*, 488 F.2d 1169 (9th Cir. 1973), stated: "The government has the burden of showing by a preponderance of the evidence that one or more of these exceptions [to the Fourth Amendment] exists."

■ A border search is an exception to the Fourth Amendment; a critical fact of that exception is that a border crossing occurred. That fact must be proved by a preponderance of the evidence. An agent's "suspicion" or "firm belief" may be an evidentiary matter, but the view of an agent, in itself, is not sufficient to justify application of the extended border category; there must be proof, by a preponderance of the evidence, that a border crossing occurred. *United States v. Richards*, supra, is the correct statement of this requirement.

■ Where the Fourth Amendment exception is based on the extended, rather than the actual border, an additional element is required. The Fifth Circuit (*Richards*, supra) states this additional requirement as a showing that conditions remained unchanged from the time of the border crossing until the subsequent warrantless search, and explains the proof is usually by evidence of constant surveillance or evidence that contraband was not likely to have been introduced during any breaks in the surveillance. This proof, of no change from the time of the border crossing, is required to bring the non-border search to the border. See *United States v. Johnson*, supra, footnote 11. *United States v. Richards*, supra, requires the showing that contraband did cross the border be established to a reasonable certainty. Reasonable certainty is required "[b]ecause the primary

justification for the relaxation of fourth amendment standards in these situations is the crossing of a border . . . ." We do not understand *United States v. Jacobson*, supra, to state a different standard.

■ Once a border crossing is established by a preponderance of the evidence and unchanged conditions are established to a reasonable certainty after the crossing, on what authority may agents conduct a search? Customs officials are authorized by 19 U.S.C.S. § 482 (1977) to conduct a border search if they "have a reasonable cause to suspect there is merchandise which was imported contrary to law . . . ." *United States v. Ramsey*, supra, states: "The 'reasonable cause to suspect' test adopted by the statute is, we think, a practical test which imposes a less stringent requirement than that of 'probable cause' imposed by the Fourth Amendment as a requirement for the issuance.of warrants." The Fourth Circuit (*Bilir*, supra) and Fifth Circuit (*Richards*, supra) apply this standard. To the extent the Ninth Circuit (*Jacobson* and *Moore*, supra) fails to apply this standard, that Circuit's decisions are not to be followed.

Summarizing the above discussion, the legal standard to be applied in determining the propriety of an extended border search is stated in the Fifth Circuit decision of *United States v. Richards*, supra.

■ Applying this legal standard to the facts, the search and seizure was valid—the trial court could properly rule that a border crossing was established by a preponderance of the evidence, the absence of change was established to a reasonable certainty, and Agents Berry and Garcia had a reasonable suspicion that the automobile trunk and suitcase were involved in illegal activity. See *United States v. Ramos*, 645 F.2d 318 (5th Cir. 1981); *United States v. Driscoll*, supra.

The order denying the motion to suppress is affirmed.

IT IS SO ORDERED.

WALTERS, C. J., and HENDLEY, J., concur.