Lori GRAVES; Jeffrey Kerns; Kenneth Malone, Plaintiffs,

and

Jonathan Crowell; Gary Bizek, Plaintiffs–Appellants,

v.

CITY OF COEUR D'ALENE; Coeur D'Alene Police Department; Coeur D'Alene City Attorneys Office; Jeffrey Jones; Ken Timmons, individually and in his professional capacity as a captain of the Coeur D'Alene Police Department; Carl Bergh, individually and in his professional capacity as a captain of the Coeur D'Alene Police Department; Defendants,

and

Greg Surplus, individually and in his professional capacity as a lieutenant of the Coeur D'Alene Police Department; D.C. Dixon, individually and in his professional capacity as an officer of the Coeur D'Alene Police Department; R. Turner, individually and in his professional capacity as a detective of the Coeur D'Alene Police Department, Defendants–Appellees.

No. 02–35119.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 9, 2003.

Filed Aug. 1, 2003.

Lawrence A. Hildes, Berkeley, CA, and Bernard Zahela, Wildlands Interstate Legal Defense Fund, Boise, ID, for the plaintiffs.

Randall R. Adams, Quane Smith L.L.P., Coeur d'Alene, ID, for the defendants.

Before: CUDAHY,* O'SCANNLAIN, and GOULD, Circuit Judges.

## OPINION

GOULD, Circuit Judge:

Plaintiffs Jonathan Crowell and Gary Bizek were arrested while protesting an

---

* The Honorable Richard D. Cudahy, Senior United States Circuit Judge for the Seventh Circuit Court of Appeals, sitting by designation.

Aryan Nations parade in Coeur d'Alene, Idaho, on July 18, 1998. Crowell was arrested for obstruction of justice after he refused to consent to the search of his backpack. Bizek was arrested for possession of a deadly weapon after he aroused suspicion by wearing attire that covered his face and by walking without putting weight on the cane he carried. Crowell was prosecuted and tried by a jury for obstructing an officer on April 14 and 15, 1999, but was not convicted in this trial because of a hung jury.[1] Bizek received a citation shortly after his arrest on July 18, 1998; his case was dismissed by the county prosecutor after arraignment.

Plaintiffs on April 7, 1999, filed a complaint under 42 U.S.C. § 1983 in the United States District Court for the District of Idaho.[2] Both Bizek and Crowell alleged, *inter alia,* claims of false arrest in violation of the Fourth Amendment. The defendants are law enforcement officers with the City of Coeur d'Alene: Defendant Daniel Dixon, Defendant Gregory Surplus, and Defendant Robert Turner.[3] After a three-day jury trial of plaintiffs' civil rights claims, the jury returned a verdict for the defendants, finding no liability. Plaintiffs filed a post-trial motion for judgment notwithstanding the verdict pursuant to Fed.

R.Civ.P. 50 and, in the alternative, a motion for a new trial pursuant to Fed. R.Civ.P. 59. The district court denied those motions, concluding that sufficient evidence was presented to the jury to support its verdict, that reasonable minds could differ on the evidence, and that the verdict was not contrary to the great weight of evidence. On appeal, the plaintiffs challenge the district court's denial of their motion for judgment notwithstanding the verdict and denial of their motion for a new trial.

Applying the standards for relief of judgment notwithstanding the verdict and new trial, to resolve this case we must consider the evidence that went to the jury and determine whether defendant Turner arrested Bizek; whether defendant Surplus, as a supervising officer, acted affirmatively to deprive Crowell of his constitutional rights; and whether defendant Dixon had the legal authority to search Crowell's backpack and therefore to arrest Dixon for obstruction of justice when Crowell refused to consent to the search. We have jurisdiction, 28 U.S.C. § 1291, and we affirm.

**I**

Given the jury verdict for defendants, the defendants are "entitled to have the

1. As of June 1, 2001, Crowell was awaiting retrial. The record does not indicate whether Crowell was retried and, if so, the result of the second jury trial.

2. Five plaintiffs were named in the complaint: Gary Bizek, Jonathan Crowell, Lori Graves, Jeffrey Kerns, and Kenneth Malone. All claims brought by Graves, Kerns, and Malone were dismissed by the district court on partial summary judgment. Only Bizek and Crowell proceeded to trial in this section 1983 action and they are the only appellants.

3. The City of Coeur d'Alene and other city and county employees, while named defendants in the original complaint, are not parties to appeal. Adopting the report and rec-

ommendation of the Magistrate Judge on the defendants' motion for summary judgment, on July 20, 2001, the district court dismissed all claims except the false arrest claims brought by plaintiffs Bizek and Crowell under 42 U.S.C. § 1983 against defendants Dixon, Surplus, and Turner. All claims alleged by plaintiffs Graves, Kerns, and Malone were dismissed. All claims of plaintiffs Bizek and Crowell against defendants other than Dixon, Surplus, and Turner were dismissed. Defendants Turner, Dixon and Surplus did not assert qualified immunity in seeking summary judgment, in trial proceedings, or in opposing plaintiffs' motion for judgment notwithstanding the verdict or a new trial. Nor have defendants urged that we may consider qualified immunity on this appeal.

evidence viewed in a light most favorable to [them], resolving conflicts in [their] favor and giving [them] the benefit of reasonable inferences, to determine whether substantial evidence supported the verdict." *Murphy v. F.D.I.C.*, 38 F.3d 1490, 1495 (9th Cir.1994).[4] For this reason, the factual statement herein is based largely on the testimony of the defendants, even though their testimony was contradicted in part by Bizek and Crowell. *See id.*

Members of a group known as Aryan Nations planned a parade through the downtown streets of Coeur d'Alene for July 18, 1998. This group, which expressly adopts, champions, and advances Nazi principles and philosophy, was known by law enforcement officers in Coeur d'Alene to have a "propensity for violence."

There was community controversy in the days leading up to the parade. Law enforcement agencies had gathered intelligence regarding groups that might come to Coeur d'Alene to support or protest the Aryan Nations.[5] The Jewish Defense League, a self-described "controversial" group that condones the use of "strength, force, and violence," indicated through its chairman, Irv Rubin, that the Jewish Defense League would protest and warned explicitly that the streets would "run red with blood." Other groups and individuals were also expected to protest. Plaintiffs Bizek and Crowell, who did not previously know each other, were among several hundred people gathering in Coeur d'Alene on July 18, 1998, to protest the Aryan Nations group and its hate-filled message.[6] The law enforcement community was apprehensive about the march and protest. City police, state troopers, and other law enforcement personnel were worried that they and members of the public were at risk and would be injured before the day was done.

Law enforcement agencies also had received intelligence in a teletype that explosives had been stolen from a construction site in Ada County a few days before the parade.[7] Although Ada County is in southern Idaho and Coeur d'Alene is in northern Idaho, about 300 miles away, the Ada County Sheriff's Office put northern Idaho agencies on notice of the theft of the explosives.[8] And while the record does not show that defendants Surplus and Dixon knew the type of explosives stolen, their testimony shows that they were concerned with protecting the crowd from the threat of explosive disruption and injury. Thus, fear and apprehension about the parade and protest were intensified. With this background, we turn to further facts par-

4. *See also* discussion of standard of review *infra* Section II.

5. As Dixon testified: "There was intelligence that was gathered through various sources on potential groups that are coming to Coeur d'Alene to protest.... The Jewish Defense League, information of people out of Seattle, the rumor was Black Panthers. There was just numerous groups coming to support it."

6. Again, as Dixon testified: "Being a hate group just north of here in Hayden Lake, they marched on the sidewalks before, they have never marched on the street before, but they marched on the sidewalk in '96, I believe, up and down carrying banners and spreading their message of hate, as well as some bombings they were involved in in the mid '80s here in Coeur d'Alene."

7. The stolen explosives were quantities of ammonium nitrate, a blasting explosive used at times in construction and a chemical fertilizer such as was used in the 1995 Oklahoma City bombing of a Federal Building.

8. It is a reasonable inference for the jury that the notification was given pursuant to standard law enforcement procedures. It is not remote, and the jury might reasonably infer, that persons planning violence might steal the instrumentalities of violence from a location within a day's drive of a target.

ticular to the claims of plaintiffs Bizek and Crowell.

## A

Plaintiff Gary Bizek injured his knee a few weeks before the parade and carried a cane to help him walk in Coeur d'Alene. On the day of the parade, Bizek wore a T-shirt with a confrontational message that said "Take your f[ ]ing race war and shove it up your [ ]." (expletives deleted). Bizek also covered his face with a T-shirt because he did not want to be recognized by the "media or other skinheads."

Defendant Turner was assigned as a detective with the Interagency Drug Task Force on the day of the parade. He was dressed in civilian clothes and was responsible for observing and reporting suspicious activity. Turner described himself as engaged in "surveillance eyes and ears," to be "unseen, unheard of unless [he] saw something to be pointed out." When Turner reported suspicious activity of any individual, a uniformed officer was then to contact the described individual for further investigation. Turner testified that his job was not to make arrests, because that would thwart his undercover role.

Before the parade began, Turner while serving undercover noticed Bizek in a group and became suspicious that Bizek's cane might be a weapon:

Well, I immediately noticed their attire. There was a group of at least four individuals dressed the same. I noticed the chains around their waists, ankles and a couple of them had their faces covered. And then the writing on the back of the shirt and so that immediately I recognized that as something suspicious to me. . . . I noticed walking behind him

that he was not using the cane, leaning on it at all, he wasn't putting any weight on it.

Turner called in a description of Bizek over the radio and said that Bizek was suspicious. Other officers stopped Bizek. Turner confirmed the identification and then walked away. Turner did not tell anyone to arrest Bizek, did not place handcuffs on Bizek, did not tell Bizek he was under arrest, and did not help transport Bizek to jail.[9] After he was "contacted," Bizek was arrested and taken to the holding facilities. He was not told why he was arrested and he could not identify the officer who arrested him.

After the parade and protest, another deputy told Turner that Turner was listed on the booking sheet as the arresting officer in Bizek's arrest. Turner went to the jail, talked to Bizek, and then issued Bizek a citation after consulting with Turner's sergeant. Turner cited Bizek for possession with intent to assault with a deadly weapon, his cane, under Idaho Code § 18–3301. Bizek signed his citation and was released. Turner wrote the police report.

## B

On the morning of July 18, 1996, Crowell drove to Coeur d'Alene from Moscow, Idaho, with a group of about 50 people who planned to demonstrate against the Aryan Nations parade. Crowell carried a sign that said "Earth first, hatred last." He also carried a heavy backpack. Crowell testified that "[i]t was definitely loaded with stuff. I carry a very heavy backpack."

When Crowell first approached the parade area, several officers asked the crowd: "Has anybody checked your back-

---

**9.** Turner's limited role after spotting Bizek was consistent with Turner's mission and aim to remain undercover.

pack yet?" Crowell was aware that some people opened their bags voluntarily, while others kept walking. Crowell did not open his backpack because felt he had a right not to be searched and he kept walking without stopping for the officers.

Later, as Crowell and some friends within his group continued to make their way toward the parade, Trooper Lind from the Idaho State Police Department approached Crowell and asked to search his backpack. Crowell refused and again continued walking. Lind asked to search Crowell's backpack several times. Lind told Crowell that he wanted to search for "public safety" and that the police wanted to "check backpacks for bombs and weapons." Lind told Crowell that if Crowell did not comply with the request to search, Crowell would have to keep moving. Crowell walked in the direction that Lind told him to walk.

As Crowell was walking with Trooper Lind, defendant Dixon, an officer with the City of Coeur d'Alene police department, approached and asked if there was a problem. There were already large numbers of spectators "lining the streets" and "police barrier tape" on the street and, in Dixon's words "a buzz in the air with ... tension, hostility." Lind explained to Dixon that Crowell "would not let him look in his backpack." Dixon testified that when he observed Crowell's backpack, he noticed that "[i]t was heavy" and that there were two "round cylindrical type objects in the bottom of the backpack." Dixon also testified that he believed he had probable cause to search Crowell's backpack:

In my mind, I had probable cause to believe that there were explosives possibly in a coffee can or the cylindrical-type objects in the bottom of the backpack [that] were packed side by side, the heaviness of it, again the teletype from Ada County Sheriff's Office, attention Northern Idaho, the Olympic Park bombings.[10]

Other than the heavy nature of the backpack and the cylindrical shape of objects observed to be in the backpack, Dixon testified that he had no other basis particular to Crowell to believe that Crowell was carrying a bomb. Dixon said that Crowell was not otherwise suspicious.

Dixon demanded that Crowell consent to a search of his backpack.[11] Crowell did not consent to search. And, Crowell, though explicitly asked, declined to give his name. Dixon viewed Crowell as "defiant," he was concerned that

[Crowell] was getting louder and louder saying, 'This is a violation of my civil rights.' He was certainly drawing a crowd of media people to him and more attention upon himself. I could feel the tension in the air just getting thicker and thicker around me, which I did not want. I had a choice that hey, either I arrest him or I let him go. It is one of those two. I could let him go, he gets down by the resort plaza and there could be explosion. They would say 'hey, why didn't you deal with it at the time?' Or I could act as I did and take an arrest, which I did.

Although Dixon described Crowell as "defiant," Dixon also testified that Crowell did not call Dixon any names, swear at

---

10. Dixon's quoted testimony above mentioning the "Olympic Park bombings" harkens back to his earlier trial testimony that he knew that in Atlanta in 1996 bombs were brought to the location and detonated in a backpack in a crowded area.

11. Before encountering Crowell, Dixon had searched about fifteen other bags. All those searches were consensual.

him, threaten him, physically attack him, verbally attack him, or insult him. Crowell's "defiance" was, according to Dixon, primarily Crowell's loud refusal to consent to search.

Dixon then radioed his supervisor, Lieutenant Hotchkiss of the Coeur d'Alene police, and explained that a man with a backpack refused consent. According to Dixon, Hotchkiss told Dixon to "deal with it." A few seconds later defendant Surplus, also of the Coeur d'Alene police, got on the radio and told Dixon "we need to look at that pack and if he won't let us look in the pack, [you] need[ ] to arrest him." There was no further communication with Hotchkiss or Surplus.

After getting off the radio, Dixon told Crowell that if he did not consent to search, he would be arrested for obstructing an officer. Crowell responded that it was his Fourth Amendment right not to be searched. Dixon then placed Crowell under arrest, took Crowell's backpack off of him, and put flex cuffs on Crowell's hands. Crowell chose passively to resist the arrest by falling to the ground. Dixon then checked the backpack and found nothing in it other than peanut butter, jelly, applesauce, bread, sneakers and clothes.

After Crowell was arrested, he dropped to the ground in protest. Dixon and Lind then each grabbed an arm and dragged Crowell along the sidewalk to the police van. Crowell, who was not wearing shoes, told the officers that they were hurting his legs and that he would like to put his shoes on.[12] The officers asked Crowell if he wanted to walk. Crowell indicated that he did not want to walk and thus continued his protest. Dixon and Lind continued to move Crowell because tension was mounting in the crowd and they wanted to get

him out of there. After about one block, they arrived at the police van and put Crowell into the van. He was taken to a holding facility and then to jail.

## C

Trial of the claims asserted by Bizek and Crowell began on September 4, 2001, and ended two days later on September 6, 2001. During trial, the jury heard testimony from Lina Gooley, a friend of Crowell who was with him at the Aryan Nations parade; plaintiff Jonathan Crowell; Jennifer Riego, a friend of Bizek who saw him get arrested at the parade; plaintiff Gary Bizek; defendant Robert Turner; James Patrick Melton, a police officer for the Kootenai County Sheriff's Department who was Turner's partner during the parade; defendant Gregory Surplus; and defendant Daniel Dixon. After deliberation upon unchallenged jury instructions, the jury returned a verdict finding no liability as to each defendant. Judgment was entered for defendants on September 18, 2001. Plaintiffs then filed a post verdict motion for judgment notwithstanding the verdict and, in the alternative, for a new trial.

In denying the motions, the district court noted that "if reasonable minds could differ over the verdict, [judgment not withstanding the verdict] is improper," citing *Peterson v. Kennedy,* 771 F.2d 1244, 1252 (9th Cir.1985). The district court stressed:

Based on the above standard, the Court finds substantial evidence exists to support the jury's verdict. While reasonable minds could differ on the verdict, substantial evidence was presented to allow reasonable minds to reach the verdict rendered in this case. This court

---

12. Plaintiff Crowell did not contend that excessive force was used and the jury was not instructed on a theory of excessive force.

Plaintiffs did not object to the jury instructions.

will not overturn the jury's verdict which resolved the conflicts presented.

The district court also rejected the motion for new trial pursuant to Fed.R.Civ.P. 59. With regard to Bizek, the district court held that "the verdict is not contrary to the clear weight of the evidence and the verdict does not result in the miscarriage of justice" because the jury was presented with credible testimony from defendant Turner and his partner, who testified that Turner did not arrest Bizek. With regard to Crowell, the district court opined that Crowell's claims were "a closer call" but that the credible testimony of defendant Dixon, combined with other facts presented, "supports the probable cause determination for the arrest." The district court declined to "grant a new trial merely because a jury could have drawn different inferences or conclusions from the facts."

## II

 The district court's ruling on a motion for judgment notwithstanding the verdict, made under Fed.R.Civ.P. 50(b), is reviewed de novo. *See James v. Wal–Mart Stores, Inc.*, 279 F.3d 883, 886 (9th Cir. 2002). Judgment as a matter of law is proper if the evidence, viewed in the light most favorable to the nonmoving party, permits only one reasonable conclusion. *See McLean v. Runyon*, 222 F.3d 1150, 1153 (9th Cir.2000). *See also Murphy*, 38 F.3d at 1495 (recognizing that "[w]e are required to sustain a judgment based on a jury verdict if it was supported by ... such relevant evidence as reasonable minds might accept as adequate to support a conclusion.") (internal quotation marks omitted).

 It appears from the record, though neither party raises this issue, that the plaintiffs in this case did not move for a judgment as a matter of law under Fed. R.Civ.P. 50(a). The motion later made by plaintiffs pursuant to Fed.R.Civ.P. 50(b) was therefore procedurally flawed. *James*, 279 F.3d at 886–87 (recognizing that because Wal–Mart failed to move for judgment as a matter of law before submission of the case to the jury, "Wal–Mart failed to comply with the procedural prerequisite for renewing its motion for [judgment as a matter of law] after trial. The Ninth Circuit construes this requirement strictly") (internal citations omitted). Ordinarily, when a party files a procedurally flawed Rule 50(b) motion, the challenge to the jury's verdict is reviewed only for plain error and reversal is proper only to avoid a "manifest miscarriage of justice." *See id.* at 888. *See also Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1148 (9th Cir. 2001) ("We will review for plain or fundamental error [in a civil case] ... where the integrity or fundamental fairness of the proceedings in the trial court is called into serious question").

This case, however, presents additional circumstances that have not before been considered by us: Here the defendants did *not* object to the district court when the plaintiffs filed a Rule 50(b) motion without having filed a Rule 50(a) motion for directed verdict. Accordingly, the district court ruled on the Rule 50(b) motion as if a motion for directed verdict had been properly filed.[13]

 Under these circumstances, we will follow the same standard applied by the district court. We join the unanimous authority of our sister circuits and hold that where a defendant does not object to an improperly-filed Rule 50(b) motion, and does not raise the issue of default for

---

13. On appeal defendants still do not argue that the Rule 50(b) motion was improper, but assume the proper standard for review is sufficiency of the evidence.

failure to abide Rule 50(a) before the trial court, then the procedural flaw in the Rule 50(b) motion is waived and we will review the district court's denial of such a Rule 50(b) motion de novo under a sufficiency of the evidence standard. *See Whelan v. Abell,* 48 F.3d 1247, 1253 (D.C.Cir.1995). *See also, Thomas v. Texas Dep't of Criminal Justice,* 297 F.3d 361, 367 (5th Cir. 2002) (reviewing a procedurally-flawed Rule 50(b) motion de novo under a sufficiency of the evidence standard because "[a] party who does not raise the waiver bar when opposing a [R]ule 50(b) motion may not raise that bar on appeal"); *Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc.,* 295 F.3d 1065, 1076 n. 3 (10th Cir.2002) (same); *Williams v. Runyon,* 130 F.3d 568, 572 (3d Cir.1997) (same); *Gibeau v. Nellis,* 18 F.3d 107, 109 (2d Cir.1994) (same); *Collins v. Illinois,* 830 F.2d 692, 698 (7th Cir.1987) (same); *Beauford v. Sisters of Mercy–Province of Detroit, Inc.,* 816 F.2d 1104, 1108 n. 3 (6th Cir.1987) (same); *Halsell v. Kimberly–Clark Corp.,* 683 F.2d 285, 293–95 (8th Cir.1982) (same). *Cf.* 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2537 (Supp.2003) ("[I]f the opposing party does not object to or specifically argue against the assertion of a new ground, that party may have waived that defense to the motion on appeal").

■ The district court's denial of plaintiffs' motion for new trial is reviewed for abuse of discretion. Reversal of the district court's denial of a motion for a new trial is proper "if the district court made a legal error in applying the standard for a new trial or if the record contains no evidence in support of the verdict." *Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1189 (9th Cir.2002).[14]

## III

■ Bizek argues that defendant Turner should be held liable for Bizek's allegedly false arrest. Without deciding whether Bizek was falsely arrested for possessing a deadly weapon, we must determine whether the jury could reasonably conclude that Turner was not the arresting officer, and thus could not be liable for Bizek's arrest.[15]

Turner initiated police contact with Bizek after Turner noticed Bizek in the crowd and became suspicious of Bizek based on his attire and his manner of walking without putting weight on his cane. Because Turner was stationed as an undercover officer in civilian clothes, he did not approach Bizek. Rather, Turner radioed Bizek's description to other officers so that they could "contact" Bizek and investigate Turner's suspicions. When the other officers located an individual matching Turner's description, Turner confirmed to the officers that they had "contacted" the correct individual.

■ Even though Turner initiated police contact with Bizek, Turner did not tell the other officers to take Bizek into custo-

14. The district court recognized that it could grant a new trial if " 'the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.' " (quoting *United States v. 4.0 Acres of Land,* 175 F.3d 1133, 1139 (9th Cir.1999)). The district court applied the correct legal standard.

15. As to Bizek's claim, the jury was instructed that "in order to determine whether the acts or omissions of defendant Turner caused the deprivations of plaintiff Bizek's constitutional rights, you must first decide by a preponderance of evidence whether defendant Turner arrested plaintiff Bizek." The jury's verdict for defendants can be sustained if there is sufficient evidence to permit a jury to conclude that Turner did not make the arrest.

dy. Turner did not take Bizek into custody or handcuff Bizek. Turner did not talk to Bizek until after Bizek had been taken to the jail. Bizek was arrested, by being taken into custody, before Turner had any direct contact with Bizek. *See Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (stating that an arrest occurs when a reasonable person would have believed that he or she was not free to leave). After Bizek's arrest Turner issued Bizek a citation when Turner visited Bizek at the jail. But such a citation of a person already arrested does not make Turner the arresting officer. *See Wilson v. Strong,* 156 F.3d 1131, 1134 (11th Cir. 1998); *Johnson v. Barker,* 799 F.2d 1396, 1399 (9th Cir.1986) (holding that issuance of a citation did not "approach" an arrest for purposes of a false arrest claim).

Possibly on the evidence presented a jury could have ruled either way in deciding if Turner made the arrest of Bizek. But viewing the evidence in the light most favorable to Turner, we conclude that the jury's determination that Turner was not the arresting officer was reasonable and permissible as a matter of law. Further, the district court did not abuse its discretion in denying Bizek's motion for a new trial because there was sufficient evidence to support a conclusion that Turner was not the arresting officer. We affirm the district court's denial of the motion for judgment notwithstanding the verdict and its denial of the motion for a new trial with regard to Bizek.

## IV

The next claim that we address on appeal is whether defendant Dixon violated Crowell's Fourth Amendment right to be free from unreasonable seizure when Dixon arrested Crowell after he refused to consent to the search of his backpack at the Aryan Nations parade. According to Dixon, his encounter with Crowell posed a frustrating dilemma with two choices: let Crowell go and risk an explosion in the crowd or arrest him. Whatever else is shown by the jury's verdict in favor of Dixon, it surely means that the jury credited Dixon's explanation of his predicament as being sincere and reasonable. Notwithstanding our caution about second-guessing decisions of law officers made under pressure when quick decisions are required, and notwithstanding the jury's decision about Dixon's sincere interest in protecting the public, we must assess whether the evidence permitted a jury conclusion that Dixon's actions were reasonable in light of the constitutional requirement for reasonable searches and seizures.

### A

An arrest is unlawful unless there is probable cause to support the arrest. *Michigan v. Summers,* 452 U.S. 692, 700, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). Crowell was arrested for "resisting and obstructing officers" pursuant to Idaho Code § 18–705. Under Idaho state law, a person obstructs an officer when that person "resists, delays, or obstructs any public officer, in the discharge, or attempt to discharge, of any duty of his office." Idaho Code § 18–705. Defendant Dixon takes the view that Crowell obstructed Dixon by not telling Dixon his name and by refusing to allow Dixon to search Crowell's backpack at the Aryan Nations parade.[16]

That Crowell refused to give Dixon his name cannot be a basis for the arrest because Crowell has a "clearly es-

---

**16.** Dixon's testimony acknowledged that Crowell did not call Dixon any names, swear at him, threaten him, physically attack him, verbally attack him, or insult him.

tablished Fourth Amendment right not to identify himself." *Carey v. Nevada Gaming Control Bd.*, 279 F.3d 873, 881–82 (9th Cir.2002) (holding that statutes authorizing arrests for obstruction of justice are unconstitutional to the extent that the arrest is based on an individual's refusal to identify himself). In *Carey*, we also relied on our reasoning in *Lawson v. Kolender*, 658 F.2d 1362, 1366 (9th Cir.1981), in which we explained that statutes authorizing arrest for a refusal to provide identification are unconstitutional because "the statutes bootstrap the authority to arrest on less than probable cause, and [because] the serious intrusion on personal security outweighs the mere possibility that identification may provide a link leading to arrest."

■ Further, that Crowell refused to consent to search cannot be a basis for the arrest *unless* Dixon had a right to search Crowell's backpack independent of Crowell's refusal. *United States v. Prescott*, 581 F.2d 1343, 1351 (9th Cir.1978).[17] To conclude otherwise would be illogical because Crowell has a constitutional right to refuse consent to an unlawful search. *See id.; United States v. Fuentes*, 105 F.3d 487, 490 (9th Cir.1997) ("People do not have to voluntarily give up their privacy or freedom of movement, on pain of justifying forcible deprivation of those same liberties if they refuse.")

The legality of Crowell's arrest turns on whether Dixon had legal authority to search Crowell's backpack, either because Dixon had probable cause to search Crowell's backpack or because the demand to search was otherwise lawful. If Dixon had an inadequate basis in law to search Cro-

well's backpack, arresting Crowell for refusing to consent to search was unlawful. On the other hand, if Crowell refused a lawful search, he was lawfully arrested for obstructing an officer.

■ Because the Fourth Amendment requires that all searches and seizures be reasonable, the legality of Dixon's search of Crowell's backpack depends on whether the search was reasonable. In the ordinary case, reasonableness requires that searches be supported by probable cause. *Brinegar v. United States*, 338 U.S. 160, 164, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). *See also Carroll v. United States*, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (holding that "the true rule is that if the search and seizure without a warrant are made upon probable cause . . . the search and seizure are valid"). Probable cause means more than a bare suspicion; it exists when the officer's knowledge of reasonably trustworthy information is sufficient to warrant a prudent person to believe that an offense has been or is being committed. *See Brinegar*, 338 U.S. at 175–76, 69 S.Ct. 1302. *See also United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir.1990). Further, "[a] search or seizure is ordinarily unreasonable in the absence of *individualized* suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (emphasis added).

Dixon argues that the following facts gave rise to probable cause to search Crowell's backpack: (1) Crowell did not consent to search; (2) Crowell did not give his name when asked; (3) Crowell's backpack

---

**17.** The Idaho Supreme Court similarly has recognized that the legality of an arrest for obstructing an officer under the Idaho Code depends on the lawfulness of the officer's request. *See State v. George*, 127 Idaho 693, 905 P.2d 626, 632 (1995) (holding that be-

cause officer's request for license, registration and proof of insurance was lawful, defendant's refusal to produce those documents constituted obstructing an officer within the meaning of Idaho Code § 18–705).

was heavy and there were two cylindrical objects in the bottom of the backpack; (4) during contact, Crowell became increasingly loud, drawing a crowd of bystanders; (5) there was a perceived threat of violent confrontation at the Aryan Nations parade; (6) the Aryan Nations was known to have a propensity for violence; (7) the leader of the Jewish Defense League had said that the streets of Coeur d'Alene would "run red with blood;" (8) explosives, such as pipe bombs and coffee can bombs, can be cylindrical in shape; (9) people can and do carry bombs in backpacks, such as occurred in the 1996 Olympic Park bombing in Atlanta; and (10) a teletype alerted law enforcement agencies in northern Idaho that explosives had been stolen from·a construction site in southwestern Idaho.

Two of the facts prominently urged by Dixon to support probable cause cannot correctly be a part of our probable cause evaluation. First, that Crowell refused to consent to search cannot be used to establish probable cause. *Gasho v. United States,* 39 F.3d 1420, 1439 (9th Cir.1994) (holding that it is clearly established law that refusal to consent to warrantless search "could not serve as a basis for finding criminal intent"); *Prescott,* 581 F.2d at 1351 (recognizing that the constitutional right to refuse consent to a search

cannot be a crime "*[n]or can it be evidence of a crime* ") (emphasis added).

Second, that Crowell refused to give Dixon his name cannot be used to support probable cause. *Poulas v. United States,* 95 F.2d 412, 413 (9th Cir.1938) (in the context of a *Terry*-type stop, "no adverse inference can be drawn from the refusal" to respond to an officer's request). In *Lawson,* 658 F.2d at 1366–67, we rejected the idea that the refusal to identify oneself to an officer can elevate mere "reasonable suspicion" to probable case. *Lawson* invalidated a vagrancy statute that permitted an arrest when an individual refused to identify himself to an officer who had reasonable suspicion of criminal activity under the *Terry v. Ohio* standard. *Id.* at 1366. Such a statute, we reasoned, would reduce the standard for arrest from probable cause to suspicion. *Id.* at 1367. *Lawson,* therefore, teaches us that probable cause must be established independent of a suspect's refusal to give his or her name.[18]

Even though Crowell's refusal to give his name or to consent cannot be used to assess probable cause, Dixon does assert three facts particular to Crowell that might give rise to individualized suspicion of wrongdoing, if their weight is sufficient in the risk-filled context of the protested

18. Although the Supreme Court has not explicitly addressed whether officers can accord any weight to an individual's refusal to state his name in a probable cause analysis, our circuit's rule in *Lawson* follows naturally from the Supreme Court's repeated pronouncements that individuals have a right not to respond to officers during a *Terry* stop. *See Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (holding that during a *Terry* stop, "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. *But the detainee is not obliged to respond.*") (emphasis added); *Florida v. Royer,* 460 U.S. 491, 497–98, 103 S.Ct.

1319, 75 L.Ed.2d 229 (1983) (holding that a person approached by an officer "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way"); *Davis v. Mississippi,* 394 U.S. 721, 727, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (holding that it is a "settled principle that while the police have the right to request citizens to answer voluntarily questions concerning unsolved crimes they have no right to compel them to answer"); *Terry v. Ohio,* 392 U.S. 1, 34, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (White, J., concurring) (observing that "the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest").

parade: that Crowell had a heavy backpack, that two cylindrical-shaped bulges were visible to Dixon at the base of the backpack, and that Crowell became increasingly loud during his confrontational encounter with Dixon.

█ Because probable cause is considered in light of the totality of the circumstances, *Ornelas v. United States,* 517 U.S. 690, 702, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), these individualized facts should properly be considered in the context of the dangerously hostile atmosphere of this particular parade, heralded by Aryan Nations' publicity and the Jewish Defense League's threatened response. *See United States v. Canada,* 527 F.2d 1374, 1380 (9th Cir.1975) (holding that an incident's occurrence in "an area with a high incidence of contraband smuggling" weighed in the probable cause determination); *United States v. Orozco,* 982 F.2d 152, 154 (5th Cir.1993) (including in the probable cause determination the fact that the arrest took place in area where drug activity was common); *United States v. Davis,* 458 F.2d 819, 822 (D.C.Cir.1972) (holding that the high-crime nature of the neighborhood is a "valid consideration when coupled with other reliable indicia or suspicious circumstances"). *See also Carroll,* 267 U.S. at 159–60, 45 S.Ct. 280 (considering, in the probable cause analysis, the fact that defendants were known "bootleggers" and were driving from Detroit, at that time a frequent source of supply for bootlegged liquor).

Also significant is Dixon's knowledge of the 1996 Olympic Park bombing in Atlanta, during which a backpack bomb exploded. The Olympic Park bombing, though not connected to Crowell, is still relevant as we assess probable cause because it shows that law enforcement can have a genuine concern that violent people can carry explosives in a backpack. And explosives carried in a backpack might be cylindrical in form.[19] Dixon also relies on the teletype received by the Coeur d'Alene law enforcement agency reporting explosives stolen from a construction site in southwestern Idaho. This is relevant to the probable cause analysis because it establishes evidence that illicit explosives might be available and present in the area.

█ The hostile atmosphere of the Aryan Nations parade colors Crowell's otherwise ordinary conduct (carrying a heavy backpack in a crowd) sufficiently to give rise to the articulable reasonable suspicion necessary to establish grounds for an investigatory stop. *See Terry v. Ohio,* 392 U.S. at 26–27, 88 S.Ct. 1868. After Dixon detained Crowell for questioning pursuant to a *Terry*-type stop, however, Dixon did not develop any further facts that would increase a reasonable officer's suspicion of Crowell.[20] Dixon testified that aside from Crowell's backpack, Dixon had no other reason to suspect Crowell was carrying explosives.

19. Dixon's explosives training, even if limited to two or three hours, is significant in that it demonstrates that he knew that bombs can be cylindrical in shape and packed in hard objects such as a coffee can that would easily fit within a backpack and that in a crowd could potentially kill, maim, or injure scores of people.

20. On appeal, Dixon asserts that Crowell aroused additional suspicions during the stop because Crowell became increasingly loud during the encounter. But Crowell was primarily asserting his Fourth Amendment right not to be searched and was speaking loudly to generate witnesses to his protest. While such behavior may have been discourteous or obnoxious or irritating to Dixon, we cannot conclude in the context of this case that Crowell's verbal assertion of his constitutional right to be free from unreasonable search, even if wrongly asserted, can be said to increase an officer's suspicion that a crime had been or was being committed by Crowell.

The question before us is whether the totality of the circumstances relating to Crowell's carrying of his backpack to the Aryan Nations parade, considered in context, is enough not only to give rise to reasonable suspicion but also to create probable cause. This is a difficult question that we consider cognizant of the significance that a jury, entrusted to consider the evidence and uphold the law, returned a verdict for Dixon. And the district court denied relief on the post-verdict motions. Faced with the responsibility of de novo review of the motion for judgment notwithstanding the verdict, we do not lightly cast aside the solemnity of the jury's verdict, nor our respect for the district court's review of the issue we now address. But we must nevertheless consider whether our law can support a finding of probable cause even when we assume that the jury resolved all fact issues in favor of Dixon.

Because the law does not permit consideration of Crowell's refusal to consent to search or his refusal to give his name, we are left only with Dixon's observation that Crowell carried a heavy backpack with bulges in an indisputably dangerous setting. Because people might frequently carry innocent objects in hard containers in backpacks, Dixon's observation of cylindrical objects at the base of Crowell's backpack does not furnish any substantial degree of particularized suspicion regarding Crowell in this context, despite the potentially incendiary atmosphere of the parade and protest. The heaviness of the backpack is also not a substantial factor, both because explosives need not be heavy to cause injury and death, and because many innocent objects such as books may add weight to a backpack. While the teletype about stolen explosives would add something to a case where objectively suspicious activity was manifested by a suspect, again there was nothing shown to link the stolen explosives to Crowell any more than to all others who carried backpacks, whether light or heavy, with or without hard bulges, to the parade.

 Viewing the facts in the light most favorable to Dixon, there is insufficient individualized suspicion to support the jury's finding of probable cause.[21] We recognize that the hostile circumstances of the parade, which included specific intelligence supporting anticipation of violence, can be considered in the probable cause analysis. But the context of the parade is not a complete substitute for particularized suspicion. In a sense, members of a grateful public might consider Dixon's actions laudable, motivated as they were by a desire to protect the public from explosives at some personal risk. Nonetheless, a good motive is not sufficient to show probable cause, and Dixon did not give adequate weight to what the Fourth Amendment requires us to place at the heart of our probable cause assessment—consideration of evidence supporting *individualized* suspicion. We acknowledge that the Aryan Nations parade, attendant with explicit threats of violence and stolen explosives, created a challenge for law enforcement in Coeur d'Alene that was totally unprecedented in their experience. Yet, we cannot avoid the conclusion that Dixon erred on probable cause when he allowed the serious dangers presented to the public at the parade to dominate the traditional determinants of probable cause and sub-

**21.** In section 1983 claims, the existence of probable cause is a question for the jury if reasonable persons might reach different conclusions on the facts. *De Anda v. City of Long Beach,* 7 F.3d 1418, 1422 (9th Cir.1993); *Smiddy v. Varney,* 665 F.2d 261, 265 (9th Cir.1981). Here, even resolving all factual disputes in favor of Dixon and consistent with his own testimony, a reasonable jury could have reached only one conclusion—there was no probable cause.

stantially to eclipse the weight that must be given to individualized suspicion if we are to preserve the privacy of our citizens. We hold that there was no probable cause to support the search as a matter of law.[22]

**B**

 Even though we hold that Dixon did not have probable cause to search

Crowell's backpack, the district court's denial of Crowell's motion for judgment notwithstanding the verdict may nevertheless have been proper if Dixon is entitled to qualified immunity.[23] In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court announced a two-step approach to evaluating qualified immunity claims. In the first step, we

**22.** There also exists no other basis upon which to support the legality of Dixon's demand to search. Dixon has not asserted that the search can be justified under the Supreme Court's "special needs" doctrine. The Supreme Court has held that "[a] search unsupported by probable cause can be constitutional ... [in those exceptional circumstances in which] special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 653, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (internal quotation marks omitted). But the Supreme Court has never endorsed a general idea that for individual searches considerations of public necessity may be said to trump the probable cause requirement. Despite the public safety reasons for searching bags at the Aryan Nations parade, special needs searches must be "exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Florida v. Wells,* 495 U.S. 1, 3–4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990); *United States v. Bulacan,* 156 F.3d 963, 974 (9th Cir.1998) (holding a regulation authorizing administrative searches unconstitutional because the regulation did not "create an established procedure that limit[ed] discretion and set [] the parameters of the search").

Here, there was no organized methodology for systematically checking all individuals who entered the area. And, there were no checkpoints through which all people had to pass before entering the vicinity of the parade. Rather, the officers generally asked the crowd whether their bags had been checked. Some people walked over to the officers and allowed a bag search; others kept walking without consequence. Because the Coeur d'Alene police officers possessed unguided discretion, absent specified criteria, to carry out suspicionless bag searches, special needs cannot serve as the legal authority for Dixon's

demand to search Crowell's backpack. We note that Coeur d'Alene could use the Supreme Court's "special needs" jurisprudence to protect the public when crowds are threatened by potential violence so long as the Coeur d'Alene police follow the standards that the Supreme Court has set. *Cf. Wilkinson v. Forst,* 832 F.2d 1330, 1340 (2d Cir.1987) (upholding suspicionless magnetometer searches upon entering the vicinity of Ku Klux Klan rallies when all individuals were searched and notices were posted to give individuals the option to leave the area if they did not want to be searched).

**23.** The defendants asserted the qualified immunity defense in their answer to the complaint. Because we may affirm the decision of the district court on any ground supported by the record, *see Rivero v. City and County of San Francisco,* 316 F.3d 857, 862 (9th Cir. 2002), we will address the qualified immunity issue sua sponte on appeal. *Cf. Sonoda v. Cabrera,* 255 F.3d 1035 (9th Cir.2001) (reviewing the merits of the district court's sua sponte grant of qualified immunity when defendants raised qualified immunity as a defense in their answer). Also, while we generally do not address issues raised for the first time on appeal, we have nevertheless done so in exceptional circumstances such as when "the issue presented is purely one of law and either does not depend on the factual record developed below or the pertinent record has been fully developed." *Marx v. Loral Corp.,* 87 F.3d 1049, 1055 (9th Cir.1996) (internal citation and quotation omitted). *See also In re America West Airlines, Inc.,* 217 F.3d 1161, 1165 (9th Cir.2000) (addressing an issue raised for the first time on appeal because the issue was one of law and the factual record had been fully developed). Qualified immunity is an issue of law and, to the extent that it depends on the factual record, that record has been fully developed below, as it is the same record that relates to whether there was prob-

consider whether a constitutional right was violated by the officer's conduct. *Id.* at 200–01, 121 S.Ct. 2151. Because we have already concluded that Dixon violated Crowell's Fourth Amendment right to be free from unreasonable searches and seizures, we now conduct the second step of *Saucier* and ask "whether the right was clearly established." *Id.* at 201, 121 S.Ct. 2151.

■■■ Whether a right is "clearly established" for purposes of qualified immunity is an inquiry that "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201, 121 S.Ct. 2151. In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202, 121 S.Ct. 2151. *See also Cruz v. Kauai County,* 279 F.3d 1064, 1069 (9th Cir.2002) (recognizing that for a right to be clearly established, "[t]he right must be established at more than an abstract level.")

■■■ In this case, we consider whether a reasonable officer in Dixon's situation would understand that he lacked probable cause to search for suspected explosives in Crowell's backpack in the proximity of a crowded street-lined parade.[24] We undertake this inquiry keeping in mind the Supreme Court's clear explanation of reasons for giving a qualified immunity in the context of excessive force, which we have here adapted as applied to probable cause:

> It is sometimes difficult for an officer to determine how the relevant legal doctrine, here [probable cause], will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether [search based on those relevant facts] is legal in those circumstance. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Saucier,* 533 U.S. at 205, 121 S.Ct. 2151.

Here, Dixon was confronted with an undeniably incendiary situation. A violent hate group was about to march down the streets of Coeur d'Alene through a crowd of impassioned and, in some cases, violent protestors and supporters. Dixon testified

---

able cause to search. For the same reasons that *Marx* permitted an issue newly raised on appeal, we think it appropriate sua sponte to consider the issue of qualified immunity on this appeal, thus applying *Marx* to cover another circumstance where decision turns on a legal issue supported by an adequate record.

**24.** Ordinarily for qualified immunity we view facts in the light most favorable to the party asserting the injury. *Mena v. City of Simi Valley,* 332 F.3d 1255, 1261 (9th Cir.2003). Here, because we consider qualified immunity in an unusual procedural setting after a jury verdict, and as part of plaintiff's appeal from the denial of plaintiff's motion for judgment notwithstanding the verdict, it is not entirely clear whether we should consider the evidence in the light most favorable to Crowell, the party asserting the injury, or to Dixon, the nonmoving party. We ordinarily would have considered qualified immunity as a question of law before a jury verdict, with all disputed facts and reasonable inferences viewed in the light favorable to Crowell. But in the setting presented, Dixon is the nonmoving party, after a favorable jury verdict. This raises a complex issue, but one that we need not decide, for the outcome of the qualified immunity analysis is the same in any event and so we decide this issue assuming that the facts are viewed favorably to Crowell: Crowell's testimony and evidence at trial did not dispute the incendiary nature of the parade, including threatened violence, and did not suggest that Dixon's concern for public safety was not genuine. Crowell also admitted that he carried a heavy backpack and it was not disputed that there were cylindrical objects in it. Crowell did not raise any genuine issue of fact on material issues regarding the factors relied on by Dixon in his probable cause analysis, but rather urged that factors Dixon considered were inadequate.

that Coeur d'Alene law enforcement had never experienced any situation quite like this. In addition, Dixon knew that stolen explosives were at large and could be present at the parade. Dixon thus confronted an atypical situation bounded by actual and credible threats of violence, the potential of hostile actors, missing explosives and throngs of innocent persons watching the parade. When he encountered Crowell, Dixon observed Crowell's heavy backpack with cylindrical bulges at its base. After Crowell refused to consent to search, Dixon was left with an unpleasant choice and a risky dilemma: Dixon could arrest Crowell and search the backpack, or Dixon could let Crowell go forward in the crowd despite Dixon's suspicion that Crowell had explosives in his backpack.

Faced with this dilemma, Dixon made his probable cause determination, but he was required to do so on the spot and at the moment without the benefit of clear guidance from the law on whether the incendiary circumstances of the protested Nazi parade could be given controlling weight in determining probable cause. It is clear that the potentially violent nature of the parade properly informs the probable cause analysis. *See United States v. Canada*, 527 F.2d at 1380; *Orozco*, 982 F.2d at 154; *Davis*, 458 F.2d at 822. But none of these cases, nor any explicit decision of the Supreme Court, makes clear how much weight the nature of an area can be given in the probable cause analysis. In *Brown v. Texas*, the Supreme Court did consider that the arrest took place in an area known for high incidence of drug traffic; but with regard to the weight to be given such a factor, the Court only said that the reputation of a neighborhood as frequented by drug users cannot "standing alone" give rise to probable cause when there is otherwise an "absence of any basis for suspecting [the individual] of misconduct." 443 U.S. 47, 52, 99 S.Ct. 2637, 61

L.Ed.2d 357 (1979). In this case, Dixon did articulate some individualized suspicion regarding Crowell—the heaviness of the backpack and the bulges.

Though we above concluded that Dixon relied too heavily on the context of the hostile and volatile parade, rather than the individualized factors, we had the luxury of making our decision only after thoroughly reviewing the relevant legal authorities, and after applying the law to the facts removed from the intense anxiety to safeguard the public that Dixon and law enforcement officials felt at the Aryan Nations parade. Dixon did not have this same luxury. Police officers rarely, if ever, can objectively remove themselves from the immediate threats that they face, and yet they may have the obligation to risk their own lives to protect the public, while at the same time traversing difficult contours of constitutional law. The Supreme Court has "frequently observed ... the difficulty of determining whether particular searches or seizures comport with the Fourth Amendment." *Anderson v. Creighton*, 483 U.S. 635, 644, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). For this reason, "[l]aw enforcement officers whose judgments in making these difficult determinations are objectively legally reasonable should no more be held personally liable in damages than should officials making analogous determinations in other areas of law." *Id.*

■ Given the volatile nature of the parade and the potential for grave injury that Dixon sought to interdict, we conclude that a reasonable officer in Dixon's situation could have believed that those circumstances carried enough weight to create probable cause when there was at least some individualized suspicion. We hold that Dixon is entitled to qualified immunity, because the law did not provide him

clear guidance as to how much weight he could give the explosively hostile circumstances of the Nazi parade in making his probable cause assessment. In the extraordinary circumstances of this case, Dixon made a reasonable mistake.[25]

Because we hold that Dixon is entitled to qualified immunity, the district court did not err in denying Crowell's motion for judgment notwithstanding the verdict. And, because there was some evidence supporting the jury's verdict, the district court did not err in denying Crowell's motion for new trial.

## V

■ The final issue concerns potential supervisory liability of defendant Surplus. Crowell argues that Surplus told Dixon to arrest Crowell and should be held liable, with Dixon, for violating Crowell's Fourth Amendment rights.

■ Because we have determined that Dixon is not liable because of qualified immunity, it would be surprising if Surplus could be held liable as a supervisor, as Crowell alleges. In any event, under our law section 1983 suits do not impose liability on supervising officers under a respondeat superior theory of liability. *Rise v. Oregon*, 59 F.3d 1556, 1563 (9th Cir.1995). Instead, supervising officers can be held liable under section 1983 "only if they play an affirmative part in the alleged deprivation of constitutional rights." *Id.* (internal quotations omitted). The supervising officer has to "set in motion a series of acts by others ..., which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir.1991) (internal quotations omitted).

Here, Dixon communicated by radio to his supervisor, Lieutenant Hotchkiss, that a man with a backpack refused to consent to search. Hotchkiss told Dixon to "deal with it." Surplus then on the same radio told Dixon to arrest Crowell if he did not consent to search. There was no evidence of any further communication by Dixon with Hotchkiss or Surplus directing arrest of Crowell. At trial, Surplus testified that he assumed Dixon had probable cause to search the backpack and that he thought Dixon was asking whether officers were supposed to make arrests that day. Dixon testified that he did not consider Surplus's comment to be an instruction, but rather to be advice.

This evidence was equivocal and Crowell had a right to have his claim against Surplus presented to the jury along with his claim against Dixon. However, the jury verdict is fatal to Crowell's claim against

---

**25.** It is not inconsistent to hold that no reasonable jury could find probable cause but that Dixon is nonetheless entitled to qualified immunity. This is so because of the difference in the applicable standards. We assess whether a reasonable jury could find there was probable cause—supporting its verdict for defendant—"under the principles [we] announced and on the basis of the evidence presented." *See Boyle v. United Tech. Corp.*, 487 U.S. 500, 513–14, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). But in evaluating qualified immunity, we ask whether a reasonable officer "at the moment" of search, without the benefit of our reasoned declaration of the principles we have just announced, could reasonably believe he had probable cause. *See Saucier*, 533 U.S. at 205–06, 121 S.Ct. 2151. The qualified immunity defense recognizes that officers make probable cause assessments in the field under pressure and therefore affords the officer leeway, permitting a reasonable mistake without resulting individual liability of the officer, when the law is not clearly established. *Id.* at 205, 121 S.Ct. 2151. Though both Dixon and the jury were incorrect to find probable cause to search Crowell's backpack, Dixon is nevertheless entitled to qualified immunity as the application of the probable cause requirement in context was not clearly established.

Surplus. Viewing the evidence in the light most favorable to Surplus, a jury could reasonably conclude that Dixon decided to arrest Crowell independent of Surplus's statement on the radio. Dixon did not tell Hotchkiss or Surplus any information about why Dixon wanted to search Crowell's backpack. It is thus plausible that Dixon did not understand Surplus's statement to be an assessment of the legality of the search and that Surplus's explanation could be credited by a jury. Even if Surplus's statement had the practical effect of encouraging Dixon to arrest Crowell, the evidence did not require the jury to conclude that Surplus knew or had reason to know that the arrest would be unlawful. Instead, the jury's determination that Surplus did not play an affirmative part in the deprivation of Crowell's constitutional rights is reasonable as a matter of law.

■ Further, the district court did not abuse its discretion in denying Crowell's motion for a new trial on claims against Surplus because there was evidence to support a conclusion that Surplus did not act affirmatively and did not set Crowell's arrest in motion. We affirm the district court's denial of the motion for judgment as a matter of law and new trial with regard to Crowell's claim against Surplus.

**AFFIRMED.**